KRISTEN CLARKE, Assistant Attorney General
REBECCA B. BOND, Chief
KATHLEEN P. WOLFE, Special Litigation Counsel
KEVIN J. KIJEWSKI, Deputy Chief
CHARLOTTE LANVERS, Trial Attorney (CSBN 257814)
JANE ANDERSEN, Trial Attorney (NYRN 4651519)

U.S. Department of Justice
950 Pennsylvania Ave, N.W., - 4 CON
Washington, D.C.  20530
Telephone: (202) 305-5703
Facsimile: (202) 305-9775
Charlotte.Lanvers@usdoj.gov
Jane.Andersen2@usdoj.gov

Attorneys for Plaintiff United States of America

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br>    v.<br><br>Barnet Dulaney Perkins Eye Center, PC, an Arizona professional corporation,<br><br>    Defendant. | **CASE NO.**<br><br>**DEMAND FOR JURY TRIAL** |

The United States of America alleges the following:

**I.   INTRODUCTION**

1.  The United States files this action to enforce Title III of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12181–12189, and its implementing regulation, 28 C.F.R. Part 36, against Defendant Barnet Dulaney Perkins Eye Center, PC ("Defendant" or "BDP"), a medical provider with 24 facilities specializing in optometry and ophthalmology care.

2.  Title III of the ADA requires that public accommodations, including medical providers, give individuals with disabilities a full and equal opportunity to access their health care services and facilities.

1

3. Title III also prohibits medical providers from imposing additional fees or surcharges to cover the costs of measures that are necessary to provide individuals with disabilities with the nondiscriminatory treatment required by the ADA.

4. Defendant discriminates against individuals with disabilities who, because of disability, need assistance transferring to and from wheelchairs for surgery. Defendant requires such individuals to retain third-party medical support personnel to not only assist with transferring them to and from surgical tables but also to transport them to and from BDP facilities on gurneys or stretchers.

5. The Attorney General has commenced this action based on a determination that (1) Defendant is engaged in a pattern or practice of discrimination and that (2) Defendant discriminated against a person or group of persons and that such discrimination raises an issue of general public importance. The United States seeks declaratory and injunctive relief, monetary damages, and a civil penalty against Defendant.

## II.     JURISDICTION AND VENUE

6. This Court has jurisdiction over this action under 42 U.S.C. § 12188(b)(1)(B) and 28 U.S.C. §§ 1331 and 1345. The Court may grant declaratory relief and further necessary or proper relief pursuant to 28 U.S.C. §§ 2201 and 2202, and may grant equitable relief, monetary damages, and a civil penalty pursuant to 42 U.S.C. § 12188(b)(2).

7. Venue is proper in this Court because Defendant is a professional corporation with its principal place of business in this District, Defendant operates medical practices in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District. 28 U.S.C. § 1391.

## III.     PARTIES

8. Plaintiff is the United States of America.

9. Defendant Barnet Dulaney Perkins Eye Center, PC, is an Arizona professional corporation with its principal place of business at 63 South Rockford Drive, Suite 220, Tempe, Arizona 85281. BDP operates 24 medical facilities in Arizona, specializing in optometry and ophthalmology. Defendant is a public accommodation within the meaning of 42 U.S.C. § 12181(7)(L).

10. The Complainant is an individual with a disability because she has multiple sclerosis and quadriplegia, physical impairments that substantially limit one or more major life activities or major bodily functions, including neurological function, operation of the central nervous system, and the ability to walk. 42 U.S.C. §§ 12102(1), (2); 28 C.F.R. § 36.105(d)(2)(iii).

### IV.    FACTS

**A. Defendant Applies a Discriminatory Policy to Patients with Non-Weight Bearing Mobility Disabilities Who Require Transfer Assistance**

11. Defendant engages in a pattern or practice of discrimination against individuals who, because of disability, need assistance transferring to and from wheelchairs for surgery.

12. Prior to 2017, Defendant sometimes transferred non-weight bearing patients by lifting the patients or using gait belts for assistance.[1]

13. Since 2017, Defendant assists patients generally with transfer but not those patients who, because of disability, cannot bear weight. As Defendant states:

> If a patient is able to stand with reasonable assistance, BDP staff is able to assist transferring into an exam chair or onto a surgical table if the patient can stand and pivot to sit on the chair or table. However, all non-weight bearing patients are required to arrive on a stretcher. This enables the patient to moved [sic] from stretcher to stretcher utilizing draw sheets.

14. Defendant requires non-weight bearing patients to retain third-party medical support personnel to not only assist with transferring them to and from surgical tables but also to transport them to and from BDP facilities on gurneys or stretchers.

15. The United States Department of Justice conducted testing to evaluate Defendant's compliance with the ADA in October 2019. "Testing" refers to the use of individuals who, without any intent to partake in a given service, inquire for the purpose of gathering information. This information may indicate whether a private entity is complying with the ADA.

16. The United States' testing revealed that Defendant has engaged in discriminatory practices on the basis of disability, by treating individuals with mobility disabilities who require transfer assistance for surgery less favorably than individuals without disabilities.

---

[1] A gait belt is a wide (1 ½" to 4") belt that is wrapped around the hips or mid-section of a person who is partially ambulatory to assist with sitting, standing, and moving.

17. Specifically, the testing revealed that Defendant engaged in conduct including the following:

   a. A tester called Defendant to inquire about cataract surgery. The tester told BDP that she has a mobility disability and requires transfer assistance from and back to her wheelchair.

   b. The BDP employee stated BDP's policy is that in order to have cataract surgery the tester would need to arrive on a stretcher.

   c. The tester asked why she would have to arrive on a stretcher. Defendant's employee then said, "they can't technically remove you from the wheelchair to put you on the table, so I guess the stretcher is easier."

   d. The tester then asked whether her son could come to assist with the transfer. Defendant's employee replied, "not the actual surgery. For the surgery, you do have to arrive on the stretcher."

   e. Defendant's employee explained to the tester that a surgery scheduler would help her make arrangements with a company to provide transfer and transport services, but she was unsure of its name.

   f. The tester called Defendant back an hour later and asked about how transport would be arranged.

   g. Defendant's employee told the tester that her patient care counselor at BDP would help coordinate transportation with her.

   h. Finally, the tester asked whether Defendant would help with any part of the transfer and Defendant indicated that BDP employees would not help with the transfer at all.

**B. Defendant Refused to Provide Transfer Assistance to Ms. Jameson**

18. Martha Jameson is an eighty-year-old woman with multiple sclerosis and quadriplegia. Ms. Jameson uses a power wheelchair for mobility. She lives in Phoenix, Arizona, with her son, Trevor Hanna. Ms. Jameson relies on her son for assistance with daily transfers and activities of daily living. Mr. Hanna transfers his mother, who weighs approximately 120 pounds, without assistance.

19. After an eye examination at BDP in 2019, Ms. Jameson learned that she needed cataract surgery in each eye. She attempted to schedule the surgeries at BDP. The BDP scheduler asked Ms.

Jameson if she could get onto the surgical table without assistance. Ms. Jameson replied that she needs assistance with transfers because of her disability.

20. The scheduler responded that she did not know if BDP could do the surgeries at the BDP center because Ms. Jameson has a disability.

21. The scheduler called a supervisory nurse, Janet Morrison, for assistance.

22. When told that Ms. Jameson would need transfer assistance, the supervisory nurse explained that BDP would not transfer individuals onto surgical tables.

23. Because her vision was failing and she needed cataract surgery, Ms. Jameson called the supervisory nurse once more to see whether BDP would reconsider. The supervisory nurse said that BDP could perform the surgery, but its staff would not assist with transfers.

24. The supervisory nurse asked Ms. Jameson to have Medicare pay for ambulance transport to and transfer assistance at BDP's surgical facility.

25. Ms. Jameson objected because it was her understanding that Medicare only reimburses for emergency transport, not for routine outpatient surgery. The supervisory nurse replied, "oh well, we just can't do anything for you," and reiterated that BDP would not transfer individuals onto surgical tables.

26. Ms. Jameson asked whether BDP could use a ceiling or floor-based patient lift. She also told the supervisory nurse that her power wheelchair reclines to a flat position of 180 degrees, which would be similar to a stretcher or gurney. The supervisory nurse rejected each proposal.

**C. Defendant Imposes a Surcharge on Patients with Disabilities Who Require Transfer Assistance**

27. BDP then referred Ms. Jameson to Quality Transport Services ("QTS"), a medical transport and transfer company. The supervisory nurse volunteered to call QTS and negotiate a rate for the transport and transfer.

28. Although frustrated and feeling as though she was being discriminated against, Ms. Jameson felt an urgent need to have cataract surgeries because her vision was poor and deteriorating. Accordingly, Ms. Jameson asked the supervisory nurse to negotiate a rate with QTS. The supervisory nurse did so; the negotiated rate was $110 each way.

5

29.     Ms. Jameson ultimately had three cataract surgeries and incurred a surcharge of $220 for each round-trip to and from the BDP's surgery center, for a total of $660.

**D. Defendant's Insistence on Third-Party Transfer and Transport Assistance Was Unnecessary Because Defendant's Staff Provided Transfer Assistance to Ms. Jameson**

30.     Before the surgery, Ms. Jameson met with her ophthalmologist, Dr. Scott Perkins, a named partner at BDP.

31.     Ms. Jameson asked Dr. Perkins whether he knew about the ADA and BDP's obligations under the anti-discrimination law.

32.     Dr. Perkins explained that he did not know anything about the law or its obligations, but he volunteered that BDP used to have a lift for patient transfers and that he did not know why they stopped using it.

33.     Ms. Jameson's first surgery occurred on August 29, 2019. The morning of the surgery, QTS's driver arrived at Ms. Jameson's home. Together, the driver and Ms. Jameson's son transferred her to a gurney, and then the driver secured Ms. Jameson into the van. Her son sat in the front where the driver volunteered that QTS makes numerous trips a day among four medical practices in the area, including BDP.

34.     When they arrived at BDP, Ms. Jameson was wheeled into a hallway where she lay strapped to a gurney for thirty to forty minutes, in view of the waiting area. During this wait, Ms. Jameson had no independence or freedom of movement. While she could speak with her son, it was uncomfortable for Ms. Jameson because her son was standing awkwardly amid patient traffic making it embarrassing and difficult for her to hear and maintain a private conversation. Because of this her son eventually left and Ms. Jameson waited alone. This experience caused Ms. Jameson stress, and she would have preferred to sit with her son in the waiting room, in the same manner as patients without mobility disabilities.

35.     When it was time for her surgery, the QTS driver wheeled Ms. Jameson to the operating room. The driver stood at one corner of the gurney and a BDP staff person stood at each of the other three corners. Together, they slid her onto the surgical table. The driver's role in assisting Ms. Jameson's transfer was indistinguishable from the three BDP staff. After the surgery, the driver and

three BDP staff transferred Ms. Jameson back to the gurney. Then the driver secured Ms. Jameson into the back of the van while she was still strapped to the gurney and drove her home. Once they arrived home, the driver and Ms. Jameson's son helped transfer Ms. Jameson into her wheelchair.

36. Ms. Jameson's second surgery occurred on September 30, 2019. The transport and transfer process was largely the same as the first surgery. Again the driver and three BDP staff assisted with transfer from the gurney to the surgical table and then back to the gurney.

37. Ms. Jameson needed a third cataract surgery on November 21, 2019. The transport and transfer process was the same as for the other surgeries. During this particular trip, Ms. Jameson spoke with the QTS driver, Randy, who explained that QTS frequently takes individuals to BDP.

38. Ms. Jameson recalls feeling exhausted and frustrated each time she called BDP to repeatedly request and revisit the issue of transfer assistance.

39. Using QTS for transportation to BDP added an element of stress to each of the surgeries. During one of her six trips, the driver slammed on the brakes suddenly to avoid an accident, which caused her stress right before a surgery.

40. Ms. Jameson complained about BDP's failure to provide a lift or accommodations to individuals with disabilities with Nursing Director, Janet Morgan in late July 2019. Ms. Morgan relayed this complaint in an email to her colleagues on July 31, 2019. Thereafter, Ms. Jameson filed a complaint with the U.S. Department of Justice.

## V.     CAUSE OF ACTION
### TITLE III OF THE AMERICANS WITH DISABILITIES ACT

41. The allegations of the foregoing paragraphs are hereby re-alleged and incorporated by reference as if fully stated herein.

42. Complainant is an individual with a disability because she has multiple sclerosis and quadriplegia, physical impairments that substantially limit one or more major life activities or major bodily functions, including neurological function, operation of the central nervous system, and the ability to walk. 42 U.S.C. §§ 12102(1), (2); 28 C.F.R. § 36.105(d)(2)(iii).

43. Defendant discriminates against individuals who, because of disability, need assistance transferring to and from wheelchairs for surgery, in violation of Title III of the ADA, 42 U.S.C. §§ 12181–12189, and its implementing regulation, 28 C.F.R. Part 36.

44. Defendant discriminated against Complainant on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations in violation of Title III of the ADA, 42 U.S.C. § 12182(a), and the Title III implementing regulation at 28 C.F.R. Part 36.

45. Defendant afforded an individual or class of individuals, including Complainant, on the basis of disability, with the opportunity to participate in or benefit from a good, service, facility, privilege, or accommodation that was not equal to that afforded to other individuals, in violation of 42 U.S.C. § 12182(b)(1)(A)(ii) and 28 C.F.R. § 36.202(b).

46. Defendant imposed a surcharge on Complainant and other aggrieved individuals with disabilities to cover the costs of measures that were required to provide them the nondiscriminatory treatment required by Title III of the ADA, 42 U.S.C. § 12182 (b)(2)(A)(i) and 28 C.F.R. § 36.301(c).

47. Defendant has violated 42 U.S.C. § 12188(b)(1)(B) and 28 C.F.R. § 36.503 by engaging in a pattern or practice of discrimination against individuals who, because of disability, need assistance transferring to and from wheelchairs for surgery. This pattern or practice raises an issue of general public importance under 42 U.S.C. § 12188(b)(1)(B)(ii).

48. As a result of Defendant's discriminatory conduct, Complainant suffered emotional distress. Complainant and other persons who were the victims of Defendant's discriminatory practices are aggrieved persons under 42 U.S.C. §12188(b)(2)(B) and 28 C.F.R. § 36.503.

## VI. PRAYER FOR RELIEF

WHEREFORE, the United States prays that this Court:

49. Grant judgment in favor of the United States and declare that Defendant violated Title III of the ADA, 42 U.S.C. §§ 12181-89, and its implementing regulation, 28 C.F.R. Part 36;

50. Enjoin Defendant, its officers, agents, employees, and all others in concert or participation with it, from engaging in discrimination against individuals with disabilities, and

1 specifically from failing to comply with Title III of the ADA, 42 U.S.C. §§ 12181-89, and its implementing regulation, 28 C.F.R. Part 36;

51. Order Defendant, its officers, agents, employees, and all others in concert or participation with it, to:

    a. Modify its policies, practices, and procedures to comply with the requirements of Title III of the ADA, 42 U.S.C. §§ 12181-89, and its implementing regulation, 28 C.F.R. Part 36;

    b. Take such affirmative steps as may be necessary to restore, as nearly as practicable, Complainant and other aggrieved persons to the position that they would have been in but for Defendant's conduct;

52. Award monetary damages, including compensatory damages for emotional distress and other injuries, to aggrieved persons, under 42 U.S.C. § 12188(b)(2)(B), for injuries suffered as the result of Defendant's violation of Title III of the ADA, 42 U.S.C. §§ 12181-89, and its implementing regulation, 28 C.F.R. Part 36;

53. Assess a civil penalty against Defendant in the maximum amount authorized by 42 U.S.C. § 12188(b)(2)(C), to vindicate the public interest; and

54. Order such other appropriate relief as the interests of justice may require.

DATED: December 20, 2021.

Respectfully submitted,

s/Kristen Clarke
KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

REBECCA B. BOND
Chief

s/Charlotte Lanvers
KATHLEEN P. WOLFE
Special Litigation Counsel
KEVIN J. KIJEWSKI
Deputy Chief
CHARLOTTE LANVERS
JANE ANDERSEN
Trial Attorneys
Disability Rights Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W. – 4CON
Washington, DC 20530
202-305-5703 (telephone)
Charlotte.Lanvers@usdoj.gov
Jane.Andersen2@usdoj.gov