KRISTEN CLARKE, Assistant Attorney General
REBECCA B. BOND, Chief
KATHLEEN P. WOLFE, Special Litigation Counsel
KEVIN J. KIJEWSKI, Deputy Chief
CHARLOTTE LANVERS, Trial Attorney (CSBN 257814)
JANE ANDERSEN, Trial Attorney (NYRN 4651519)

U.S. Department of Justice
950 Pennsylvania Ave, N.W., - 4 CON
Washington, D.C.  20530
Telephone: (202) 305-5703
Facsimile: (202) 305-9775
Charlotte.Lanvers@usdoj.gov
Jane.Andersen2@usdoj.gov

Attorneys for Plaintiff United States of America

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br>    v.<br><br>Barnet Dulaney Perkins Eye Center, PC, an Arizona professional corporation, and Medical Management Resource Group, L.L.C., d/b/a American Vision Partners Holdings, L.L.C., an Arizona limited liability company.<br><br>    Defendants. | **CASE NO. CV-21-2172-PHX-SRB**<br><br>**AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

The United States of America alleges the following:

## I.  INTRODUCTION

1. The United States files this action to enforce Title III of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12181–12189, and its implementing regulation, 28 C.F.R. Part 36, against Defendant Barnet Dulaney Perkins Eye Center, PC (BDP), a medical

1

provider with 24 facilities specializing in optometry and ophthalmology care and Defendant Medical Management Resource Group, L.L.C. d/b/a American Vision Partners (AVP), an eye care practice management organization and Management Service Organization (MSO) providing management, infrastructure, and technology to BDP and other medical providers.

2. Title III of the ADA prohibits public accommodations, including medical providers, from denying individuals with disabilities the opportunity to participate in or benefit from health care services and facilities.

3. Title III of the ADA requires that public accommodations, including medical providers, give individuals with disabilities a full and equal opportunity to access their health care services and facilities.

4. Title III also prohibits medical providers from imposing additional fees or surcharges to cover the costs of measures that are necessary to provide individuals with disabilities with the nondiscriminatory treatment required by the ADA.

5. Defendants discriminate against individuals with disabilities who, because of disability, need assistance transferring to and from wheelchairs for surgery.  Defendants deny them medical services or require such individuals to retain third-party medical support personnel to not only assist with transferring them to and from surgical tables but also to transport them to and from BDP facilities on gurneys or stretchers.

6. The Attorney General has commenced this action based on a determination that (1) Defendants are engaged in a pattern or practice of discrimination and that (2) Defendants discriminated against a person or group of persons and that such discrimination raises an issue of general public importance.  The United States seeks declaratory and injunctive relief, monetary damages, and a civil penalty against Defendants.

## II.	JURISDICTION AND VENUE

7. This Court has jurisdiction over this action under 42 U.S.C. § 12188(b)(1)(B) and 28 U.S.C. §§ 1331 and 1345.  The Court may grant declaratory relief and further necessary or proper relief pursuant to 28 U.S.C. §§ 2201 and 2202, and may grant equitable relief, monetary damages, and a civil penalty pursuant to 42 U.S.C. § 12188(b)(2).

8.  Venue is proper in this Court because BDP is a professional corporation and AVP is a limited liability corporation with their principal places of business in this District, Defendants operate or manage ophthalmic practices in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District.  28 U.S.C. § 1391.

### III.  PARTIES

9.  Plaintiff is the United States of America.

10.  Defendant BDP is an Arizona professional corporation with its principal place of business at 63 South Rockford Drive, Suite 220, Tempe, Arizona 85281.  BDP operates 24 medical facilities in Arizona, specializing in optometry and ophthalmology.  BDP is a public accommodation within the meaning of 42 U.S.C. § 12181(7)(F).

11.  Defendant AVP is an Arizona limited liability corporation with its principal place of business at 2121 E Rio Salado Parkway, Ste 220, Tempe, Arizona 85281.  It is a management organization and MSO providing management, infrastructure, and technology to BDP and other medical providers.  AVP is a public accommodation within the meaning of 42 U.S.C. §§ 12181(7)(F).

### IV.  FACTS

**A. Defendants Apply a Discriminatory Policy to Patients with Non-Weight Bearing Mobility Disabilities Who Require Transfer Assistance**

12.  Defendants engage in a pattern or practice of discrimination against individuals who, because of disability, need assistance transferring to and from wheelchairs for surgery.

13.  AVP provides management, training, policies and guidance, staff, infrastructure, and technology to BDP and other ophthalmic practices, including: Southwestern Eye Center, M & M Eye Institute, Retinol Consultants of Arizona, Abrams Eye Institute, Southwest Eye Institute, Aiello Eye Institute, Havasu Eye Center, Visage Aesthetics and Plastic Surgery, and Moretsky Cassidy Vision Correction.

14.  BDP applies AVP's policy related to transferring patients.  AVP's Nursing Director also applies the policy to BDP's patients with disabilities who indicate that they require transfer assistance because they cannot transfer independently.

15. BDP uses AVP's anti-discrimination policy and grievance procedure.

16. Prior to 2017, BDP sometimes transferred non-weight bearing patients by lifting the patients or using gait belts for assistance.[1]

17. Since 2017, BDP assists patients generally with transfer, but Defendants and their policy do not provide transfer assistance to those patients who, because of disability, cannot bear weight. As Defendants state:

> If a patient is able to stand with reasonable assistance, BDP staff is able to assist transferring into an exam chair or onto a surgical table if the patient can stand and pivot to sit on the chair or table. However, all non-weight bearing patients are required to arrive on a stretcher. This enables the patient to moved [sic] from stretcher to stretcher utilizing draw sheets.

18. Defendants either refuse to provide medical services or require non-weight bearing patients to retain third-party medical support personnel to not only assist with transferring them to and from surgical tables but also to transport them to and from BDP facilities on gurneys or stretchers.

19. The United States Department of Justice conducted testing to evaluate Defendants' compliance with the ADA in October 2019. "Testing" refers to the use of individuals who, without any intent to partake in a given service, inquire for the purpose of gathering information. This information may indicate whether a private entity is complying with the ADA.

20. The United States' testing revealed that Defendants have engaged in discriminatory practices on the basis of disability by treating individuals with mobility disabilities who require transfer assistance for surgery less favorably than individuals without disabilities.

21. Specifically, the testing revealed that Defendants engaged in conduct including the following:

    a. A tester called BDP to inquire about cataract surgery. The tester told BDP that she has a mobility disability and requires transfer assistance from and back to her wheelchair.

---

[1] A gait belt is a wide (1 ½" to 4") belt that is wrapped around the hips or mid-section of a person who is partially ambulatory to assist with sitting, standing, and moving.

4

    b. The employee stated Defendants' policy is that in order to have cataract surgery the tester would need to arrive on a stretcher.

    c. The tester asked why she would have to arrive on a stretcher. The employee then said, "they can't technically remove you from the wheelchair to put you on the table, so I guess the stretcher is easier."

    d. The tester then asked whether her son could come to assist with the transfer. The employee replied, "not the actual surgery. For the surgery, you do have to arrive on the stretcher."

    e. The employee explained to the tester that a surgery scheduler would help her make arrangements with a company to provide transfer and transport services, but she was unsure of its name.

    f. The tester called BDP back an hour later and asked about how transport would be arranged.

    g. The employee told the tester that her patient care counselor at BDP would help coordinate transportation with her.

    h. Finally, the tester asked whether BDP would help with any part of the transfer and the employee indicated that BDP employees would not help with the transfer at all.

**B. Defendants Refused to Provide Transfer Assistance to Ms. Jameson**

22. In 2019, Martha Jameson was a seventy-eight-year-old woman with multiple sclerosis and quadriplegia. Ms. Jameson used a power wheelchair for mobility. She lived in Phoenix, Arizona, with her son, Trevor Hanna. Ms. Jameson relied on her son for assistance with daily transfers and activities of daily living. Mr. Hanna transfers his mother, who weighed approximately 120 pounds, without assistance.

23. After an eye examination at BDP in 2019, Ms. Jameson learned that she needed cataract surgery in each eye. She attempted to schedule the surgeries at BDP. The BDP

scheduler asked Ms. Jameson if she could get onto the surgical table without assistance. Ms. Jameson replied that she needs assistance with transfers because of her disability.

24. The scheduler responded that she did not know if BDP could do the surgeries at the BDP center because Ms. Jameson has a disability.

25. The scheduler called the Nursing Director for AVP for assistance.

26. When told that Ms. Jameson would need transfer assistance, the AVP Nursing Director explained that Defendants would not transfer individuals onto surgical tables.

27. Because her vision was failing and she needed cataract surgery, Ms. Jameson called the AVP Nursing Director once more to see whether BDP would reconsider. The AVP Nursing Director said that BDP could perform the surgery, but its staff would not assist with transfers.

28. The AVP Nursing Director asked Ms. Jameson to have Medicare pay for ambulance transport to and transfer assistance at BDP's surgical facility.

29. Ms. Jameson objected because it was her understanding that Medicare only reimburses for emergency transport, not for routine outpatient surgery. The AVP Nursing Director replied, "oh well, we just can't do anything for you," and reiterated that BDP would not transfer individuals onto surgical tables.

30. Ms. Jameson asked whether BDP could use a ceiling or floor-based patient lift. She also told the AVP Nursing Director that her power wheelchair reclines to a flat position of 180 degrees, which would be similar to a stretcher or gurney. The AVP Nursing Director rejected each proposal.

**C. Defendants Impose a Surcharge on Patients with Disabilities Who Require Transfer Assistance**

31. Defendants then referred Ms. Jameson to Quality Transport Services (QTS), a medical transport and transfer company. The AVP Nursing Director volunteered to call QTS and negotiate a rate for the transport and transfer.

32. Although frustrated and feeling as though she was being discriminated against, Ms. Jameson felt an urgent need to have cataract surgeries because her vision was poor and

deteriorating.  Accordingly, Ms. Jameson asked the AVP Nursing Director to negotiate a rate with QTS.  The AVP Nursing Director did so; the negotiated rate was $110 each way.

33.  Ms. Jameson ultimately had three cataract surgeries and incurred a surcharge of $220 for each round-trip to and from the BDP's surgery center, for a total of $660.

**D. Defendants' Insistence on Third-Party Transfer and Transport Assistance Was Unnecessary Because Defendants' Staff Provided Transfer Assistance to Ms. Jameson**

34.  Before the surgery, Ms. Jameson met with her ophthalmologist, Dr. Scott Perkins, a named partner at BDP.

35.  Ms. Jameson asked Dr. Perkins whether he knew about the ADA and BDP's obligations under the anti-discrimination law.

36.  Dr. Perkins explained that he did not know anything about the law or its obligations, but he volunteered that BDP used to have a lift for patient transfers and that he did not know why they stopped using it.

37.  Ms. Jameson's first surgery occurred on August 29, 2019.  The morning of the surgery, QTS's driver arrived at Ms. Jameson's home.  Together, the driver and Ms. Jameson's son transferred her to a gurney, and then the driver secured Ms. Jameson into the van.  Her son sat in the front where the driver volunteered that QTS makes numerous trips a day among four medical practices in the area, including BDP.

38.  When they arrived at BDP, Ms. Jameson was wheeled into a hallway where she lay strapped to a gurney for thirty to forty minutes, in view of the waiting area.  During this wait, Ms. Jameson had no independence or freedom of movement.  While she could speak with her son, it was uncomfortable for Ms. Jameson because her son was standing awkwardly amid patient traffic making it embarrassing and difficult for her to hear and maintain a private conversation.  Because of this her son eventually left and Ms. Jameson waited alone.  This experience caused Ms. Jameson stress, and she would have preferred to sit with her son in the waiting room, in the same manner as patients without mobility disabilities.

39. When it was time for her surgery, the QTS driver wheeled Ms. Jameson to the operating room. The driver stood at one corner of the gurney and a BDP staff person stood at each of the other three corners. Together, they slid her onto the surgical table. The driver's role in assisting Ms. Jameson's transfer was indistinguishable from the three BDP staff. After the surgery, the driver and three BDP staff transferred Ms. Jameson back to the gurney. Then the driver secured Ms. Jameson into the back of the van while she was still strapped to the gurney and drove her home. Once they arrived home, the driver and Ms. Jameson's son helped transfer Ms. Jameson into her wheelchair.

40. Ms. Jameson's second surgery occurred on September 30, 2019. The transport and transfer process was largely the same as the first surgery. Again, the driver and three BDP staff assisted with transfer from the gurney to the surgical table and then back to the gurney.

41. Ms. Jameson needed a third cataract surgery on November 21, 2019. The transport and transfer process was the same as for the other surgeries. During this particular trip, Ms. Jameson spoke with the QTS driver, Randy, who explained that QTS frequently takes individuals to BDP.

42. Ms. Jameson recalls feeling exhausted and frustrated each time she called BDP to repeatedly request and revisit the issue of transfer assistance.

43. Using QTS for transportation to BDP added an element of stress to each of the surgeries. During one of her six trips, the driver slammed on the brakes suddenly to avoid an accident, which caused her stress right before a surgery.

44. Ms. Jameson complained about BDP's failure to provide a lift or accommodations to individuals with disabilities to the AVP Nursing Director in late July 2019. The AVP Nursing Director relayed this complaint in an email to AVP management on July 31, 2019.

**E. Defendants Deny Services to Patients with Non-Weight Bearing Mobility Disabilities Who Require Transfer Assistance**

45. On November 1, 2021, the United States notified Defendants that the United States had investigated and determined that BDP had violated the ADA by engaging in a pattern

8

or practice of discrimination against individuals who, because of disability, cannot bear weight and thus need assistance transferring to and from a wheelchair for surgery.

46. On November 4, 2021, Patricia Sherman, an individual with disabilities limiting her mobility, including diabetes and other impairments affecting circulatory function, went to BDP at 40 Capri Boulevard in Lake Havasu City, Arizona for a preoperative appointment for cataract surgery.

47. At the appointment, Dr. Michael Campion and BDP staff told Ms. Sherman and her companion that BDP could not provide transfer assistance to Ms. Sherman. The BDP office manager said that policy was that staff could not touch Ms. Sherman.

48. BDP applies AVP's policy related to transferring patients.

49. Ms. Sherman offered to have two of her friends, who are nurses, come and assist with the transfer, but BDP staff rejected her proposal.

50. BDP refused to provide medical services to Ms. Sherman.

51. Ms. Sherman's vision deteriorated, which has limited her independence, including her ability to make or receive phone calls and read her mail. In addition to feeling a loss of independence, she states that her eyes hurt and that she lives in a world of darkness.

52. When Ms. Sherman was told that she could not have cataract surgery at BDP she cried. She went into the BDP appointment with the expectation that she would regain some or most of her vision, and with it, her independence.

53. At the time of this filing, Ms. Sherman has not had cataract surgery and her eyesight continues to deteriorate.

## V.   CAUSE OF ACTION

### TITLE III OF THE AMERICANS WITH DISABILITIES ACT

54. The allegations of the foregoing paragraphs are hereby re-alleged and incorporated by reference as if fully stated herein.

55. Ms. Jameson was an individual with a disability. Ms. Jameson had multiple sclerosis and quadriplegia, physical impairments that substantially limit one or more major life activities or major bodily functions, including neurological function, operation of the central

1  nervous system, and the ability to walk.   Ms. Sherman is an individual with a disability.  Ms.
2  Sherman has diabetes and other impairments affecting circulatory function, physical
3  impairments that substantially limit one or more major life activities or major bodily functions,
4  including endocrine and circulatory functions, and the ability to walk.  42 U.S.C. §§ 12102(1),
5  (2); 28 C.F.R. § 36.105(d)(2)(iii).

6        56.    Defendants discriminate against individuals who, because of disability, need
7  assistance transferring to and from wheelchairs for surgery, in violation of Title III of the ADA,
8  42 U.S.C. §§ 12181–12189, and its implementing regulation, 28 C.F.R. Part 36.

9        57.    Defendants discriminated against Ms. Jameson and Ms. Sherman, on the basis of
10 disability, in the full and equal enjoyment of the goods, services, facilities, privileges,
11 advantages, or accommodations in violation of Title III of the ADA, 42 U.S.C. § 12182(a), and
12 the Title III implementing regulation at 28 C.F.R. Part 36.

13       58.    Defendants denied an individual or group of individuals, on the basis of disability,
14 with the opportunity to participate in or benefit from a good, service, facility, privilege, or
15 accommodation, in violation of 42 U.S.C. § 12182(b)(1)(A)(i) and 28 C.F.R. § 36.202(a).

16       59.    Defendants afforded an individual or group of individuals, including Ms. Jameson
17 and Ms. Sherman and others similarly situated, on the basis of disability, with the opportunity to
18 participate in or benefit from a good, service, facility, privilege, or accommodation that was not
19 equal to that afforded to other individuals, in violation of 42 U.S.C. § 12182(b)(1)(A)(ii) and 28
20 C.F.R. § 36.202(b).

21       60.    Defendants imposed a surcharge on Ms. Jameson and other aggrieved individuals
22 with disabilities to cover the costs of measures that were required to provide them the
23 nondiscriminatory treatment required by Title III of the ADA, 42 U.S.C. § 12182 (b)(2)(A)(i)
24 and 28 C.F.R. § 36.301(c).

25       61.    Defendants have violated 42 U.S.C. § 12188(b)(1)(B) and 28 C.F.R. § 36.503 by
26 engaging in a pattern or practice of discrimination against individuals who, because of disability,
27 need assistance transferring to and from wheelchairs for surgery.  Defendants' discriminatory
28 acts raise an issue of general public importance under 42 U.S.C. § 12188(b)(1)(B)(ii).

62. As a result of Defendants' discriminatory conduct, Ms. Jameson, Ms. Sherman, and others similarly situated suffered emotional distress. They and other persons who were the victims of Defendants' discriminatory practices are aggrieved persons under 42 U.S.C. §12188(b)(2)(B) and 28 C.F.R. § 36.503.

## VI. PRAYER FOR RELIEF

WHEREFORE, the United States prays that this Court:

63. Grant judgment in favor of the United States and declare that Defendants violated Title III of the ADA, 42 U.S.C. §§ 12181-89, and its implementing regulation, 28 C.F.R. Part 36;

64. Enjoin Defendants, its officers, agents, employees, and all others in concert or participation with it, from engaging in discrimination against individuals with disabilities, and specifically from failing to comply with Title III of the ADA, 42 U.S.C. §§ 12181-89, and its implementing regulation, 28 C.F.R. Part 36;

65. Order Defendants, its officers, agents, employees, and all others in concert or participation with it, to:

    a. Modify its policies, practices, and procedures to comply with the requirements of Title III of the ADA, 42 U.S.C. §§ 12181-89, and its implementing regulation, 28 C.F.R. Part 36;

    b. Take such affirmative steps as may be necessary to restore, as nearly as practicable, all aggrieved persons to the position that they would have been in but for Defendants' conduct;

66. Award monetary damages, including compensatory damages for emotional distress and other injuries, to aggrieved persons, under 42 U.S.C. § 12188(b)(2)(B), for injuries suffered as the result of Defendants' violation of Title III of the ADA, 42 U.S.C. §§ 12181-89, and its implementing regulation, 28 C.F.R. Part 36;

67. Assess a civil penalty against Defendants in the maximum amount authorized by 42 U.S.C. § 12188(b)(2)(C), to vindicate the public interest; and

68. Order such other appropriate relief as the interests of justice may require.

DATED: April 18, 2022

Respectfully submitted,

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

REBECCA B. BOND
Chief

*s/Jane Andersen*
KATHLEEN P. WOLFE
Special Litigation Counsel
KEVIN J. KIJEWSKI
Deputy Chief
CHARLOTTE LANVERS
JANE ANDERSEN
Trial Attorneys
Disability Rights Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W. – 4CON
Washington, DC 20530
202-305-5703 (telephone)
Charlotte.Lanvers@usdoj.gov
Jane.Andersen2@usdoj.gov